IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

NATURES WAY MARINE, LLC, )
 )
    Plaintiff, )
 )
vs. ) Civil Action No. 12-0316-CG-M
 )
EVERCLEAR OF OHIO, LTD., )
and NIRK MAGNATE HOLDING )
CORP., )
 )
    Defendants.

## ORDER

This matter is before the court on Defendants' joint motion for partial summary judgment (Docs. 108, 109, 110, 112), Plaintiff's response in opposition (Docs. 116, 119), and Defendants' joint reply (Doc. 120). For reasons explained below, the court finds that Defendants' partial motion for summary judgment is due to be denied.

**I. PROCEDURAL HISTORY**

Natures Way Marine, LLC ("Plaintiff") filed a breach of contract lawsuit regarding its charter agreement with Everclear of Ohio, LTD. ("Everclear") and Nirk Magnate Holding Corp. ("Nirk Magnate") (collectively, "Defendants") (Doc. 1). In its complaint, Plaintiff alleged that Defendants breached the charter agreement when they stopped paying charter hire and demurrage (Doc. 1, p. 4). Defendants answered and raised breach of contract counterclaims against Plaintiff (Doc. 23; Doc. 67; Doc. 68). Defendants

subsequently filed a joint motion for partial summary judgment, now before the court, seeking to dismiss Natures Way's complaint with prejudice, grant all counterclaims, and provide additional relief to which they are entitled (Doc. 109, p. 30). Defendants also "request the opportunity to submit additional evidence concerning the specific nature and amount of their respective damages" once liability is determined (Doc. 109, p. 24). Plaintiff opposes Defendants' joint motion for partial summary judgment, and claims that there are substantial issues of material fact that make it inappropriate to dispose of each claim at this stage (Doc. 116, p. 1). Defendants reply that each breach of contract committed by Plaintiff, standing alone, is sufficient to support summary judgment in favor of Defendants (Doc. 120, p. 1).

## II. FACTS

The contract, a one-year charter agreement, required Plaintiff to transport for Defendants 30,000 barrels of spent lubes (recycled fuel oils) each month from East Liverpool, Ohio to Avondale, Louisiana (Doc. 1, Exh. 1, p. 1). Defendants agreed to pay Plaintiff per barrel actually transported (Doc. 1, Exh. 1, p. 1). The parties entered this agreement on August 9, 2011, and Plaintiff cancelled it around February 12, 2012 (Doc. 1, pp. 3 - 4). At that time Plaintiff had completed three shipments for Defendants, and Defendants had stopped paying Plaintiff demurrage (Doc. 110, pp. 11 – 13).

Defendants assert five breach of contract counterclaims in their motion for summary judgment. Because Defendants contend that each individual

breach is sufficient for summary judgment as a matter of law, the relevant facts for each counterclaim are parsed out below.

### A. Cargo Capacity

First, Defendants argue Plaintiff breached the contract when it delivered barges that did not load 30,000 barrels as contemplated in the agreement (Doc. 67, p. 13; Doc. 68, p. 14; Doc. 109, p. 9). The charter agreement includes an equipment provision, specifying that "the Owner lets and Charterer hires" a "NWM 3009 tank barge (24,600bbl calibrated), one tank barge (TBD) calibrated at 10,500bbl capacity, and adequate HP as found suitable by NWM." (Doc. 1, Exh. 1, p. 1). The charter agreement further provides that cargo will include "a minimum of 30,000 BBL's of Spent Lubes per month" (Doc. 1, Exh. 1, p. 1).

Plaintiff provided two vessels for the first shipment, the NWM 3009 and the NWM 900 (initially called the MRT 16) (Doc. 110, p. 9). The NWM 900 had a carrying capacity of roughly 9,000 barrels, less than the amount specified in the contract (Doc. 110, p. 9; Doc. 116, pp. 17 - 18). Sara Shipman Myers ("Myers"), a broker working with the parties (Doc. 109, Exh. 7, pp. 11 - 13), informed Plaintiff that the first shipment would load at approximately 92% capacity (Doc. 116, p. 17; Doc. 119, Exh. 6). In actuality the first shipment loaded at 81% capacity and contained only 27,215 barrels. (Doc. 109, Exh. 15; Doc. 116, p. 17). Defendants knew about the shortage when the first shipment loaded, and later accepted delivery in Avondale (Doc. 109, p.

3

11, Exhs. 13, 15). The second shipment, using the same two barges, loaded more than 30,000 barrels (Doc. 118, Exh. 1, p. 7). Plaintiff added a third barge for the third shipment, and delivered more than 37,000 barrels to Avondale (Doc. 118, Exh. 1, p. 7).

**B. Delayed First Shipment**

Second, Defendants argue Plaintiff failed to perform under the terms of the contract when it did not timely deliver the barges to East Liverpool for the first shipment (Doc. 67, p. 13; Doc. 68, p. 14; Doc. 109, p. 6). Plaintiff first arrived at the East Liverpool loading port on September 16, 2011, twenty-two days after the August 25, 2011 date set forth in the charter agreement (Doc. 116, p. 2). While Plaintiff and Defendants worked through this initial delay, Myers continued to work as a broker between the parties (Doc. 119, Exhs. 6, 7, 8, 13). Myers did not inform Plaintiff about any specific delivery deadline in Avondale, but she stressed that the shipments needed to "get going" (Doc. 119, Exh. 4, pp. 4 – 5; Doc. 119, Exh. 5). Plaintiff and Defendants continued communicating about the first shipment through September and October (Doc. 109, pp. 10 – 12, Exhs. 11, 15; Doc. 116, pp. 5, 11, 15). Defendants accepted and paid for the first shipment after it reached Avondale at the end of October (Doc. 110, p. 11).

**C. Insurance Coverage**

Third, Defendants argue that Plaintiff breached the contract when it failed to obtain sufficient Protection and Indemnity ("P & I") Insurance (Doc.

67, p. 13; Doc. 68, p. 14, Doc. 109, p. 7), delaying the first shipment further (Doc. 23, p. 15; Doc. 109, p. 10). When the parties entered the charter agreement Plaintiff had $50,000,000 of P&I Insurance coverage in place, which satisfied the insurance requirement at other terminals (Doc. 109, p. 7; Doc. 116, pp. 6, 12-13; Doc. 118, Exh. 1, pp. 8 – 9). On September 2, 2011, Myers first told Plaintiff about the specific terminal for delivery in East Liverpool (Doc. 116, p. 13). Plaintiff then learned that this terminal required $300,000,000 of P & I insurance coverage (Doc. 116, p. 13). This created an "unexpected" problem for Plaintiff and Defendants (Doc. 119, Exh. 7, Exh. 8, p. 4).

The charter agreement, drafted by Plaintiff (Doc. 110, p. 4), included an insurance provision that states in part "Hull and Protection and Indemnity coverage shall be carried with first class underwriter by Owner for Owner's account, with Charterer named as additional assured." (Doc. 1, Exh. 1, p. 3).[1] Despite the insurance provision, Plaintiff and Defendants decided to split the additional insurance coverage cost after learning about it (Doc. 116, pp. 14 - 15; Doc. 119, Exh. 8, p. 4). That additional cost amounted to $210,000; Defendants paid 65% of the additional cost, and Plaintiff paid for 35% (Doc. 109, p. 8, n. 3).

**D. The Leaking Barge**

Fourth, Defendants argue Plaintiff supplied an unseaworthy vessel,

---

[1] The agreement refers to Plaintiff as "Owner and/or Chartered Owner" and Defendants as "Charterer" (Doc. 1, Exh. 1, p. 1).

5

resulting in more delays (Doc. 67, pp. 13 – 14; Doc. 68, p. 15, Doc. 109, p. 8). The parties do not dispute that on October 4, 2011, the U.S. Coast Guard stopped the NWM 3009 from loading cargo at East Liverpool because it leaked (Doc. 110, p. 8; Doc. 116, p. 15). The NWM 3009 could not complete loading until the leak was repaired (Doc. 110, p. 8; Doc. 116, p. 15). This delay lasted approximately nine days (Doc. 110, p. 8; Doc. 116, p. 15).

Plaintiff admits that NWM 3009 leaked upon loading, but argues that it was not for want of due diligence (Doc. 116, pp. 15 – 16). Marine engineers certified the barge in May 2011, and the U.S. Coast Guard inspected and approved the NWM 3009 for use on June 6, 2011 (Doc. 116, p. 16; Doc. 117, Exh. 1, p. 5). Plaintiff used the NWM 3009 twice before loading the cargo for Defendants on October 4, 2011 (Doc. 116, p. 16; Doc. 117, Exh. 1, p. 5).

In addition to these facts, Plaintiff further argues that the charter agreement relieves it from liability based on the force majeure clause (Doc. 116, p. 16). That clause states in relevant part that:

> The tow, its captain and Owner shall not, unless otherwise in this charter expressly provided, be responsible for any loss or damage arising or resulting from: . . . unseaworthiness of the tow unless caused by want of due diligence on the part of Owner to make the tow seaworthy or to have it properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner."

(Doc. 1, Exh. 1, p. 2).

Because it exercised due diligence to make its barges seaworthy (Doc.

6

116, p. 16), Plaintiff argues there is a genuine dispute about a material fact for this claim.

**E. Monthly Deliveries**

Fifth, Defendants argue Plaintiff failed to complete the round-trip between East Liverpool and Avondale within the required time (Doc. 109, p. 10).[2] Before entering the agreement, Plaintiff informed Myers that a round-trip between East Liverpool and Avondale would take twenty-six to twenty-eight days (Doc. 109, Exh. 7, p. 13). Defendants believed this would allow for twelve round-trips per year (Doc. 109, p. 11), and the charter agreement references monthly deliveries (Doc. 1, Exh. 1, p. 1). The charter agreement states that the "date of deliver[ing]" the barges to East Liverpool for loading was "on or about August 25, 2011," but the agreement did not list other delivery dates (Doc. 1, Exh. 1, p. 1; Doc. 109, p. 5).

After the delays and issues described above, Plaintiff loaded the barges in East Liverpool on October 14, 2011. From beginning to end and with the aforementioned delays, the first round-trip took eighty-eight days (Doc. 109, p. 11). Plaintiff transported two more oil shipments for Defendants; the second trip took roughly forty-five days and the third trip took roughly forty-three days (Doc. 109, p. 12). Plaintiff did not complete the third round-trip as the business relationship with Defendants unraveled (Doc. 109, p. 13; Doc. 116, p. 8).

---

[2] Defendants first articulate this breach of contract counterclaim in their motion for partial summary judgment (Doc. 109, p. 10).

7

In response to this counterclaim Plaintiff asserts that on more than one occasion Defendants asked the barges to slow down (Doc. 116, p. 11; Doc. 118, Exh. 1, p. 9). Additionally, Plaintiff argues that Defendants were aware of the shipping delays, but never communicated to Plaintiff that it considered the delays a breach of contract (Doc. 116, pp. 5 – 6).

**F. Plaintiff's Breach of Contract Claim**

Approximately two weeks after delivering the third shipment to Avondale, Plaintiff cancelled the charter agreement on February 12, 2012, and put the towing vessel into service for another party (Doc. 109, p. 13; Doc. 109, Exh. 13, pp. 38 - 39). Plaintiff argues that Defendants breached the agreement by refusing to pay demurrage fees and ending communication with Plaintiff after it delivered the third shipment (Doc. 109, p. 13; Doc. 109, Exh. 13, pp. 38 – 39; Doc. 118, Exh. 1, p. 7; Doc. 119, Exh. 10). In turn, Defendants argue that Plaintiff breached the agreement as a result of the delays discussed above, and seek dismissal of Plaintiff's claims (Doc. 109, pp. 7 – 9). Plaintiff did not move for summary judgment on this claim.

**G. Defendants' damages from losing a third-party contract**

In their motion for partial summary judgment, Defendants ask the Court to determine liability before deciding damages (Doc. 109, p. 24). A particular point of contention, however, are damages resulting from business that Defendants lost with a third party, ALBA, as a result of the shipment delays (Doc. 109, pp. 2 - 3). Defendant Everclear and Defendant Nirk

Magnate entered into a joint venture agreement on June 22, 2011, to "acquire and blend physical commodities products for the purpose of resale" (Doc. 109, Exh. 1, p. 2). In furtherance of this joint venture, Defendant Nirk Magnate entered into a separate contract with ALBA dated August 21, 2011, twelve days after it entered the charter agreement with Plaintiff (Doc. 109, Exh. 3). Pursuant to the ALBA contract, Defendant Nirk Magnate agreed to deliver a fuel oil blend to ALBA by October 2011 in exchange for $14,490,000.00 (Doc. 109, p. 3; Doc. 109, Exh. 3, p 8). The fuel oil blend would have included the spent lubes being shipped by Plaintiff (Doc. 109, p. 3). ALBA, however, terminated its agreement with Defendants on October 10, 2011 because it had not yet received the first shipment of the blended fuel product (Doc. 109, Exh. 16). Defendants did not convey information about the ALBA contract to Plaintiff (Doc. 116, p. 4).

### III. STANDARD OF REVIEW

The court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law applicable to the case determines what is material. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary

9

judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In evaluating the movant's arguments, the court must view all evidence and resolve all doubts in the light most favorable to the nonmovant. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds might differ on the inferences arising from undisputed facts, then [the court] should deny summary judgment." Hinesville Bank v. Pony Exp. Courier Corp., 868 F.2d 1532, 1535 (11th Cir. 1989). The basic issue before the court then is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986). The mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton, 358 F.3d at 809.

## IV. DISCUSSION

### A. General Maritime Law

This case falls under admiralty jurisdiction, thus the court must navigate the seas of maritime law and apply it to the facts presented here.[3] "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and

---

[3] A breach of contract action will not support admiralty jurisdiction unless the underlying contract is wholly maritime in nature. Rea v. The Eclipse, 135 U.S. 599, 608 (1890).

10

newly created rules." E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864-65 (1986) (citations omitted). In the absence of controlling statutory or judicially created maritime principles, courts may apply state law provided that the law does not thwart national interests in having uniform admiralty law. Coastal Fuels Mktg., Inc. v. Florida Exp. Ship. Co., Inc., 207 F.3d 1247, 1251 (11th Cir. 2000).

Before analyzing the individual claims, general maritime law and contract principles set forth the legal framework for this case. Under maritime and contract law, an injured party is not required to repudiate the contract in order to preserve its right to sue the other for breach of the contract. Aaby v. States Marine Corp., 181 F.2d 383, 385 (2d Cir. 1950). If a charterer does not object to defects promptly, however, it may waive its breach of contract claims. U.S. Gypsum Transp. Co. v. Dampskibs Aktieselskabet Karmoy, 48 F.2d 376, 378 (E.D.N.Y. 1930) aff'd, 54 F.2d 1086 (2d Cir. 1931). Additionally, any ambiguous provision in a maritime contract is interpreted against the drafter. Edward Leasing Corp., v. Uhlig & Assoc. Inc., et al., 785 F.2d 877, 889 (11th Cir. 1986).

### B. Counterclaim I: Insufficient Cargo Capacity

Under a charter agreement the owner is obligated to provide the vessel described in the contract. Aaby, 181 F.2d at 385. Failure to comply with the terms describing the vessel can be considered a misrepresentation or a breach of the contract. In that event, the charterer may repudiate the contract prior

11

to acceptance of the vessel or sue for damages. Horn v. Cia de Navegacion Fruco, 404 F.2d 422, 429 (5th Cir. 1968) (citations omitted). After the vessel is accepted, however, the charterer can repudiate the contract and seek damages when the purported breach frustrates the purpose of the contract. See Aaby, 181 F.2d at 386 - 87; cf. Watts v. Camors, 115 U.S. 353, 362 (1885) (court affirmed damages for owner where charterers refused to accept the ship the day after owner tendered it because it did not meet contract specifications, and parties continued negotiating).

Here, the parties do not dispute that Plaintiff supplied a vessel with a carrying capacity smaller than specified in the contract. When Plaintiff first delivered the vessel, Defendants could have repudiated the contract or sued for damages, but they elected to do neither. Instead, Defendants allowed Plaintiff to use the same barge for two more shipments that included 30,000 barrels or more without objection. Under these facts, Defendants accepted the barge and waived their objection to the smaller cargo capacity. The continued use of the barge also shows that its smaller size did not frustrate the commercial purpose of the contract. Because Defendants accepted the barge and continued using it for subsequent shipments, the facts are in dispute and thus do not support granting summary judgment for this claim. Defendants' request for summary judgment based on insufficient cargo capacity is denied.

### C. Counterclaim II: First Shipment Delayed

Shipping delays and late delivery of a vessel may result in a breach of contract. The Maggie Hammond, 76 U.S. 435, 460 (1869). In that event, the charterer can accept the barge and sue to recover damages, or waive late delivery. U.S. Gypsum Transp. Co., 48 F.2d at 378. Here, Plaintiff does not dispute that it failed to deliver the barges to Defendants in East Liverpool by August 25. At that time, Defendants could have either rejected the late barges, or accepted the late barges and sued to recover damages. Horn, 404 F.2d at 429. But Defendants accepted the barges continued using Plaintiff's services for over four months without raising an objection. Accordingly, the court finds that Defendants waived their objection based on the initial late delivery when they accepted the barges and paid for the first shipment. Defendants' request for summary judgment based on this shipping delay is denied.

On a related issue, the record reflects that Defendants failed to tell Plaintiff about its October 2011 deadline with ALBA. While Defendants and Plaintiff continued communicating about other shipping matters, ALBA cancelled its contract with Defendants on October 10. Defendants never conveyed that information to Plaintiff, nor does the record reflect that Plaintiff knew about this third-party contract. Instead, Defendants proceeded with a second and third shipment of spent lubes.

For this point of the dispute the court finds Wood v. Hubbard instructive. 62 F. 753 (3d. Cir. 1894). In that case, bad weather delayed an

iron pipe shipment, which caused the charter to lose a contract with a third-party. Notably, the court acknowledged the considerable correspondence between the owner and charterer, but found the charterer provided "no notice of the necessity of a delivery" by a certain date. Wood, 62 F. at 757 – 58. For this and other reasons, the court concluded that the owner could not be charged with frustration of the charterer's third-party venture. Id. at 757- 58. Similarly, Defendants in this case did not make clear that it had a third-party contract demanding delivery by October, despite their ongoing communication with Plaintiff on other issues. Because the facts as presented support an interpretation that Defendants waived their objection to late delivery, summary judgment is not appropriate on this claim, and thus the court need not reach the issue of damages arising from this specific claim.

### D. Counterclaim III: Inadequate P & I Insurance Coverage

Although an ambiguous provision in a maritime contract is interpreted against the drafter, Edward Leasing Corp., 785 F.2d at 889, there is not a dispute based on ambiguity here. The charter agreement states clearly that P & I coverage "shall be carried . . . by Owner" (Doc. 1, Exh. 1, p. 3). As the owner, Plaintiff should have acquired the requisite insurance in accordance with the charter agreement terms.

But Defendants and Plaintiff voluntarily changed these terms when they agreed to divide the cost of the additional P & I insurance. Parties may modify the terms of their agreement and if the terms of a subsequent

agreement contradict the earlier agreement, the terms of the later agreement prevail. Scurtu v. Intl. Student Exch., 523 F. Supp. 2d 1313, 1322, n. 10 (S.D. Ala. 2007). As a result, Plaintiff and Defendants' later agreement about splitting the cost of insurance controls. Bringing a breach of contract counterclaim based on the terms of the original insurance provision while ignoring the later agreement is unfounded. Accordingly, Defendants' request for summary judgment on this breach of contract claim is denied.

### E. Counterclaim IV: Unseaworthy Vessel

"Maritime law infers a general warranty of seaworthiness from a charter-party agreement even where such warranty is not expressly made." Horn, 404 F.2d at 428. The warranty can impose a form of absolute liability on a sea vessel, liability that is completely divorced from negligence. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549-50 (1960). Under a charter agreement, only "want of due diligence on the part of the owner" can impose liability for unseaworthiness. Hampton Roads Carriers, Inc. v. Allied Chem. Corp., 329 F.2d 387, 391 (4th Cir. 1964). Additionally, a charter party may modify or waive this absolute liability with clear and unambiguous language. In re Boskalis Westminster Intern. B.V., 975 F. Supp. 2d 1238, 1247, n. 5 (S.D. Fla. 2012).

Seaworthiness generally means that the vessel is reasonably safe and fit for its intended purpose. Marshall v. Ove Skou Rederi A/S, 378 F.2d 193, 196 (5th Cir. 1967). A vessel may be deemed unseaworthy for any number of

15

reasons: its gear might be defective, its cargo loaded improperly, or its crew unfit. Morales v. City of Galveston, 370 U.S. 165, 170 (1962) (citations omitted). As a result unseaworthiness is ordinarily a question for the jury, and few cases find that a ship is unseaworthy as a matter of law. Johnson v. Bryant, 671 F.2d 1276, 1279 (11th Cir. 1982) (citations omitted).

After this warranty is breached, a charterer may repudiate the contract and seek damages. But repudiation is permissible only where the breach of seaworthiness is so substantial that it defeats or frustrates the commercial purpose of the charter. Aaby, 181 F.2d at 386; Hildebrand v. Geneva Mill Co., 32 F.2d 343, 348 (M.D. Ala. 1929).

The charter agreement states that unseaworthiness is not absolute, rather the "Owner" is not responsible for "unseaworthiness of the tow *unless* caused by want of due diligence." (Doc. 1, Exh. 1, p. 2). Plaintiff arguably used due diligence to make its barge seaworthy because the vessel had been surveyed twice and used on two other trips shortly before it began loading cargo for Defendants. Cf. Hampton Roads Carriers, Inc., 329 F.2d at 391 (surveys "are not to be discarded entirely in canvassing the attention exerted by owner to discover deficiencies" in the barge, finding owner acted with diligence to make vessel seaworthy). Neither party disputes that the barge leaked upon loading, but viewing the facts in the light most favorable to the non-moving Plaintiff, the record does not clearly show that the leak occurred for want of due diligence.

Furthermore, after learning about the leak Defendants did not repudiate the contract, object and seek damages, or immediately reject the vessel. Defendants accepted the barge and used it again in two subsequent shipments without objection. Defendants could therefore be viewed as having waived any objection to this purported breach. Additionally, any breach of seaworthiness apparently did not defeat or frustrate the commercial purpose of the contract because the parties continued using the same barge for other shipments. Accordingly, Defendants' counterclaim for breach of seaworthiness is denied.

### F. Counterclaim V: Delayed Deliveries

Defendants did not previously assert a breach of contact counterclaim based on Plaintiff's failure to undertake monthly voyages as specified in the charter agreement (Doc. 109, p. 21). At the summary judgment stage, the proper procedure for a party to assert a new claim is to amend the complaint in accordance with Federal Rule of Civil Procedure 15(a). A counterclaim plaintiff may not amend its complaint by raising new claims in a brief for summary judgment. Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004). Nevertheless, the court will review this claim.

Maritime law makes clear that shipowners must carry out the voyage with reasonable diligence. Olsen v. Hunter-Benn & Co., 54 F. 530, 531 (S.D. Ala. 1892). As mentioned, however, maritime and contract law recognizes that parties can waive breach of contract claims. See, e.g., U.S. Gypsum

Transp. Co., 48 F.2d at 378. Waiver is the intentional relinquishment of a known right, and a party's intent to waive a right can be drawn from conduct that is inconsistent with the assertion of that right. Olsen, 54 F. at 532 (stating acts can indicate waiver); Edwards v. Allied Home Mortg. Capital Corp., 962 So. 2d 194, 208-09 (Ala. 2007).

Although it is questionable whether Plaintiff could complete the trip in twenty-eight days, Defendants' conduct waived any objection to Plaintiff's three late deliveries. Defendants never refused to pay Plaintiff because of their failure to complete a trip in one month's time, nor did they object to any delays as Plaintiff unloaded and then re-delivered the barges. Defendants continued to pay for shipments and demurrage through January 2012. Apart from referencing monthly shipments and an initial delivery date of August 25, the contract detailed no other delivery deadlines. Pursuant to maritime and contract law principles, Defendants cannot accept shipments without objection and then belatedly claim breach of contract based on untimeliness. See Bennett v. Lingham, 31 F. 85, 86 (E.D.N.Y. 1887). Therefore, Defendants' request for summary judgment based on this claim is denied, and because breach of the monthly voyage provision was not alleged in the counterclaims, this issue will not be submitted to the jury.

### G. Plaintiff's claims are not dismissed

Defendants asked the court to dismiss Plaintiff's claims with prejudice. After a breach the injured party may, depending on the severity of the

18

breach, either repudiate the contract or continue the agreement and claim damages from the defaulting party. See Aaby, 181 F.2d at 385; Edwards, 962 So. 2d at 207-08. An injured party is not automatically excused from performing their remaining duties, however, if they continue the agreement with knowledge of the default by the breaching party. Dunkin' Donuts of Am., Inc. v. Minerva, Inc., 956 F.2d 1566, 1571 (11th Cir. 1992) (a breach "merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it").

The facts presented indicate that the initially injured party, Defendants, continued the agreement with knowledge of the delays and problems encountered by Plaintiff. Defendants were not automatically excused from performing their remaining duties after they decided to continue on with the commercial endeavor following the shipping delays. Accordingly, Plaintiff's claims are not dismissed with prejudice. Plaintiff did not move the court for summary judgment on its claims.

## V. CONCLUSION

Upon a thorough analysis of all matters presented, the Court concludes that there are factual disputes regarding Defendants' counterclaims and Defendants' motion for partial summary judgment is therefore **DENIED**.

**DONE** and **ORDERED** this 12th day of August, 2014.

/s/ Callie V. S. Granade
UNITED STATES DISTRICT JUDGE